Tyler J. Bowles  *  August 23, 2013

Sheet 1

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CONNIE LANGILLE and
PAUL E. LANGILLE,           )
                            ) Deposition of:
    Plaintiffs,              )
                            ) TYLER J. BOWLES
vs.                          )
                            ) Civil Action No.
TRANSCO, INC., KEITH         ) 12-CV-189-S
PETER and McLANE FOOD       )
SERVICE, INC.,              )
                            )
    Defendants.             )

August 23, 2013 * 10:01 a.m.

Location: Peck Hadfield Baxter & Moore
399 North Main Street -- 3rd Floor
Logan, Utah

Reporter: Denise M. Thomas, CRR/RPR
Notary Public in and for the State of Utah

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:

    John D. Bowers
    BOWERS LAW FIRM, PC
    Attorneys at Law
    685 South Washington
    P.O. Box 1550
    Afton, Wyoming   83110-1550
    Telephone: 307.885.0640
    Fax: 307.885.1002

FOR THE DEFENDANTS:

    Lloyd E. Smith
    MURANE & BOSTWICK, LLC
    Attorneys at Law
    508 West 27th Street
    Cheyenne, Wyoming   82001-3031
    Telephone: 307.634.7500
    Fax: 307.638.7882
    E-mail: les@murane.com

* * *

EXHIBIT B

## Page 3

INDEX

TYLER J. BOWLES                                    PAGE
Examination By Mr. Smith                             4
Examination By Mr. Bowers                           50

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Curriculum Vitae of Tyler J. Bowles | 5 |
| 2 | 2007 to 2010 U.S. Individual Returns for Connie R. Fancher and Paul Langille, Bates Nos. McClane-Coke 1177-1210 | 21 |
| 3 | 6-4-13 Expert witness report of Tyler J. Bowles | 51 |

* * *

## Page 4

PROCEEDINGS

TYLER J. BOWLES,
having been first duly sworn to tell the
truth, was examined and testified as follows:

EXAMINATION
BY MR. SMITH:
    Q.    Please state your full name.
    A.    Tyler J. Bowles.
    Q.    And I'm going to refer to you as
Dr. Bowles. I believe that's how you like to be
referred to?
    A.    That's fine.
    Q.    Dr. Bowles, what is your profession?
    A.    I'm an economist.
    Q.    And where do you work?
    A.    My primary job is with Utah State
University. I'm a professor in and department head
of the Department of Economics and Finance at
Utah State University. I also am self-employed as an
economic consultant.
    Q.    Does that economic consultant work include
expert witness work?
    A.    Yes, sir.

**13**

1 expectancy table, a work life expectancy table. Wage
2 data, both in Idaho and Wyoming, current interest
3 rates and the expected wage growth rate in both, or,
4 in addition, expected growth rate in medical prices,
5 some information concerning household survey -- a
6 household survey on the typical amount of time a
7 married female spends providing household services,
8 and, finally, some data on wage rates associated with
9 the types of services that correspond to household
10 services.
11      Q.   It appears that those items, or those
12 materials you reviewed are reflected in the footnotes
13 to your report, in a General Note on page 9 and in
14 the appendix -- appendices?
15      A.   Yes, sir.
16      Q.   You mentioned you talked to Connie
17 Langille several times.
18           Did you ever meet her in person?
19      A.   No, sir. It's my understanding she's in
20 Texas.
21      Q.   So your conversations with her occurred
22 over the telephone?
23      A.   Yes.
24      Q.   Did you have any conversations with her
25 husband, Paul Langille?

**14**

1      A.   I don't believe so, no, although, again,
2 I'm not sure. Seems like I may have, but I don't
3 have any notes that reflect that. He may have been
4 on the phone when I was talking with Connie.
5      Q.   As we sit here today, you don't recall any
6 conversations with Paul Langille?
7      A.   That's correct.
8      Q.   Did you have any conversations with any of
9 the other experts or consultants hired by the
10 Plaintiffs in this case, and specifically those whose
11 reports you reviewed, Dr. Tallerico, Kathy Gammon,
12 Suzette Pinto?
13      A.   Yes.
14      Q.   Who did you speak to?
15      A.   Ms. Gammon.
16      Q.   And when was that conversation?
17      A.   May 7, 2013.
18      Q.   What did you talk about?
19      A.   I had previously reviewed her report, and
20 I just went through her report and followed up with
21 her on some questions.
22      Q.   What questions did you follow up about?
23      A.   Well, I don't have a complete list
24 necessarily. I do have some notes that indicate
25 that, consistent with what her report says, that she

**15**

1 doesn't really know if or when -- if and when Connie
2 will be able to return to some kind of sedentary
3 work. Then she notes if she does, there will be a
4 transition into that kind of work.
5      Q.   Did she tell you anything else that was of
6 significance to your work?
7      A.   Not that I recall in that conversation.
8 Her report was fairly exhaustive.
9      Q.   The first category of economic loss you
10 set forth in your report, this appears on Table 1 as
11 Past Medical and Related Expenses; is that right?
12      A.   Yes, sir.
13      Q.   And that number that you've set forth is
14 $176,301?
15      A.   Yes.
16      Q.   And I believe your notes -- yes, in Note
17 No. 1 you indicate that that information was provided
18 to you by Connie Langille?
19      A.   It was in her Answers to the
20 Interrogatories.
21      Q.   You did not separately review her medical
22 bills, I take it?
23      A.   No, sir.
24      Q.   And you did not add up the medical
25 expenses from her medical bills?

**16**

1      A.   No.
2      Q.   So that figure is coming from Connie
3 entirely?
4      A.   That's correct.
5      Q.   Is it your understanding what she did is
6 simply add up her medical bills?
7      A.   I don't know.
8      Q.   You did not perform any economic analysis
9 of those past medical expenses?
10      A.   That's correct.
11      Q.   And you don't personally know if they're
12 accurate?
13      A.   That's correct.
14      Q.   In your note to those past medical
15 expenses, and that's Note No. 1, you state it is also
16 your understanding that interest may be available on
17 those past losses.
18           Do you know what the law is in Wyoming
19 regarding whether that kind of interest is
20 recoverable?
21      A.   Yes. It's my understanding that it is at
22 seven percent.
23      Q.   Again, but you don't purport to be a
24 lawyer, right?
25      A.   Well, I don't, but it doesn't take a

**17**

1 lawyer necessarily to understand the law, but I'll
2 defer to him at a higher paid rate for that issue,
3 but I've been involved in enough cases over the years
4 to be quite certain that on these kind of damages
5 that interest at seven percent is available, but I
6 could be wrong.
7    Q.   You could be?
8    A.   I could be. I know there's a little bit
9 of debate about it.
10    Q.   The second category of economic loss you
11 set forth in Table 1 is the Cost of Gratuitous Care
12 Provided by Paul Langille, right?
13    A.   Yes.
14    Q.   And that figure that you've supplied is
15 $13,872, correct?
16    A.   Yes.
17    Q.   What is the basis for that?
18    A.   In Paul's deposition, as well as in
19 Connie's deposition, he notes that he took
20 approximately two months to ten weeks off work to
21 care for Connie.
22    Q.   Okay. And how does that get us at
23 $13,872?
24    A.   I know his wage for 2011 from his W-2 was
25 $83,232, or $6,936 a month. I simply took two months

**18**

1 of that monthly wage rate to get $13,872.
2    Q.   Do you know whether Paul Langille was paid
3 during this time he took off to care for his wife?
4    A.   No.
5    Q.   No, you don't know?
6    A.   That's correct.
7    Q.   Do you know whether his sick or leave time
8 with his company was reduced for that time he was off
9 work?
10    A.   It's my understanding that those are all
11 collateral source issues and not relevant is my
12 understanding, so I don't.
13    Q.   So the answer is you don't know?
14    A.   I don't know.
15    Q.   Fair to say you don't know if the law
16 allows him to recover his lost wages for that time he
17 was off work?
18    A.   I don't know legal issues. From an
19 economics point of view, it is a damage. If he's not
20 working, there is damage -- a loss associated with
21 that. Whether that loss was borne by him or his
22 employer is maybe a more legal issue, but,
23 nevertheless, there is, in my judgment, an economic
24 damage associated with that.
25    Q.   And would you agree that damage occurred

**19**

1 to Paul?
2    A.   As a family they have less income.
3    Q.   Did you look at the cost of hiring care --
4 what it would cost Connie Langille to hire the care
5 that was provided by Paul?
6    A.   No.
7    Q.   Did you do any analysis of the amount of
8 care she actually required?
9    A.   No.
10    Q.   If you were looking -- if you were
11 analyzing the cost of gratuitous care provided by
12 Bill Gates if he took two months off to care for his
13 wife, would you base that on his monthly salary?
14    A.   I haven't thought about that. I don't
15 know. I'd have to think about that. That's a rare,
16 unique circumstance. Paul and Connie aren't
17 particularly unique.
18    Q.   The next category of economic loss set
19 forth in Table 1 of your report is the Present Value
20 of Lost Earning Capacity; is that correct?
21    A.   Yes, sir.
22    Q.   And the figure you give for that is
23 $335,023, correct?
24    A.   Yes.
25    Q.   Under your notes on page 3 of your report,

**20**

1 it looks like you determined a work life expectancy
2 of 13 years for Connie?
3    A.   Yes.
4    Q.   I take it that is something that we could
5 locate in the tables that you've attached as part of
6 your appendices?
7    A.   Yes.
8    Q.   Your calculation of $335,023 is premised
9 on the assumption that she will not return to work,
10 correct?
11    A.   That's correct.
12    Q.   And your assumption that she will not
13 return to work comes from your review of the report
14 of Kathy Gammon and your conversation with Kathy
15 Gammon?
16    A.   Yes.
17    Q.   If Kathy Gammon is wrong in that
18 assessment, then your assessment is wrong, correct?
19    A.   Correct.
20    Q.   One of the things you did in part of your
21 analysis of the present value of Connie Langille's
22 lost earning capacity was review her prior earnings
23 by virtue of her tax information?
24    A.   Yes.
25    Q.   What is your understanding of how she was